UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| KATHLEEN HOLMES,<br><br>               Plaintiff,<br><br>      v.<br><br>ERIK AUDUN BERSAS, ROLF<br>CHRISTIAN BERSAS, HANS BERSAS,<br>and ELLEN BERSAS, and their marital<br>communities.<br><br>              Defendants. | No. C06-1627TSZ<br><br>PLAINTIFF'S MOTION FOR PARTIAL<br>SUMMARY JUDGMENT<br><br>NOTE ON MOTION CALENDAR:<br>*December 21, 2007* |

Under Federal Rule of Civil Procedure 56, Plaintiff asks the Court to grant partial summary judgment finding liability against the Defendants as follows: (1) That Plaintiff Kathleen Holmes suffers from severe spinal osteoarthritis, fibromyalgia, migraines, and depression to an extent that constitute disabilities within the meaning of the federal Fair Housing Act, 42 U.S.C. §3601 et seq. and the Washington Law Against Discrimination, RCW 49.60.222; (2) That for Defendants' apartment to be available to Ms. Holmes within the meaning of these laws, Ms. Holmes needed a reasonable accommodation or modification to relieve her pain and increase her functioning in the form of a hydrotherapy tub installed at her expense; (3) That

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT - 1
USDC WDW NO. C06-1627TSZ

Defendants refused to engage in the "interactive process" with Ms. Holmes about her request for a reasonable accommodation or modification in the form of her tub; (4) That Ms. Holmes's requested accommodation was reasonable as a matter of law; (5) That Defendants delayed and denied Ms. Holmes's requested reasonable accommodation; and (6) That Defendants' refusal to engage in the interactive process and denial of Ms. Holmes's request to use her hydrotherapy tub installed at her own expense violated the FHAA and the WLAD.

## UNDISPUTED FACTS

### Ms. Holmes is Disabled[1]

"Ms. Holmes has the following chronic disabling conditions: osteoarthritis, degenerative disc disease, osteoarthritis of the cervical spine and lumbosacral spine, fibromyalgia, migraine headaches, and depression. These are permanent conditions and severe." Declaration of Paul Brown, M.D., Ph.D., at 6:10-13.

"Her impairing conditions already affect her in the following ways: She is in chronic severe pain. Her ability to concentrate is substantially impaired. She has significant impairment of sleep. She is unable to sit, walk, or stand for prolonged periods of time. She cannot do repetitive tasks. She cannot work. She cannot lift or carry greater than 10 lbs. and 10 lbs. only on occasion. She can reach overhead only occasionally. She can bend only occasionally. She cannot squat, kneel, crawl, climb, or twist. With flare-ups of these conditions, she spends much of her time in bed. She also has to change position frequently." Id. at 6:14-20.

Ms. Holmes is 62 years old. Holmes Dec. ¶1. She has been a registered nurse since 1977, however, in 1999, she became disabled and unable to work due to severe pain and limits in

---

[1] Defendants have not disclosed a medical expert witness and have no knowledge of Ms. Holmes's medical condition, disabilities, and treatment with hydrotherapy. See, e.g. R. Bersas Dep. at 37:6-21 (Q: "Do you have any reason to believe that [Ms. Holmes] did not need [the tub] for pain control?" A: "No."). Accordingly, the facts are taken from the uncontrovertable declarations of Ms. Holmes and of her expert, Paul Brown, M.D., Ph.D., board certified rheumatologist and internist, who is a Clinical Professor of Medicine at the University of Washington and is President of the Washington State Academy of Pain Management. See Dec. of Paul Brown, M.D., Ph.D., at 1 ("Qualifications" heading).

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT - 2
USDC WDW NO. C06-1627TSZ

MacDONALD HOAGUE & BAYLESS
1500 HOGE BUILDING
705 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1745
(206) 622-1604
FAX: (206) 343-3961

her functioning resulting from osteoarthritis, fibromyalgia, migraines, and depression, and has not worked since. *Id.* at ¶2.

As a result of her medical conditions, her daily life is substantially limited. She cannot reach over shoulder height, lift or carry over 10 lbs., vacuum, climb stairs, kneel down, or step on a step stool without severe pain. She needs help to carry groceries and to take out garbage. Her van has a lift so she can take a mobility scooter to any place where she will need to travel further than one block. *Id.* at ¶3.

Ms. Holmes cannot sleep more than 45 minutes to an hour at a time without severe pain waking her and forcing her to change position. The lack of restful sleep causes her to feel depressed and the pain causes her to be very isolated. It is difficult for her to get out to do anything with friends so she is alone much of the time. Depression causes her to have mood swings and feel sad or irritable and that life is passing her by. *Id.* at ¶4. She spends many hours a day lying down on an electric blanket and heating pads to ease the constant severe pain. She must move very slowly because of the pain and her balance has deteriorated considerably and causes her difficulty in many daily activities. She walks along walls to steady herself when possible and uses a cane when necessary. *Id.* at ¶5.

Because of the nerve damage and pain in her neck, arms, and hands she cannot do repetitive tasks like typing, crocheting, knitting, embroidery, or writing for longer than about 15 minutes without causing dramatic increases in the nerve pain. Standing to wash dishes or to cook is very painful and she has to do such activities in bits and pieces over an hour or two to complete the tasks of minimal housekeeping. *Id.* at ¶6. Similarly, she has difficulty concentrating due to pain. She frequently misses planned events because she does not remember what day of the week it is, or the date. It is very difficult for her to keep current on bills for the same reason so she has had to set all her bills up on automatic bill pay. *Id.* at ¶7.

The pain that Ms. Holmes feels has been so severe and unremitting that during and after her tenancy with Defendants, she thought about suicide. *Id.* at ¶9.

MacDONALD HOGUE & BAYLESS
1500 HOGE BUILDING
705 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1745
(206) 622-1604
FAX: (206) 343-3961

"Ms. Holmes's substantial limitations resulting from her severe chronic medical conditions are consistent with the well-documented literature," and with the experience of Dr. Brown as "a physician specializing in osteoarthritis, fibromyalgia, and pain management." Brown Dec. at 6:24-26.

**Hydrotherapy Is an Appropriate and Effective Treatment for Ms. Holmes**

"Hydrotherapy is an accepted treatment in the medical literature for Ms. Holmes's disabilities. It is effective in the following ways: it significantly reduces muscle spasm and pain, increases flexibility and range of motion, and therefore would allow Ms. Holmes to significantly increase her activity. Hydrotherapy done on a regular basis can significantly change the quality of Ms. Holmes's life, increase her activities of daily living, improve muscle strength, and reduce some of her impairments. She will also notice from hydrotherapy an increase in sleep and therefore reduced fatigue and reduced cognitive difficulties." *Id.* at 8:23-9:2. He notes: "If Ms. Holmes was my patient, I would prescribe hydrotherapy to treat her." *Id.* at 8:21-22.

Since 1991, Ms. Holmes has owned a tub that she has used for hydrotherapy; often several times per day, and just before sleep. Her ability to sleep is extended a great deal (sometimes 4-5 hours at a time) when she has use of the hydrotherapy tub before sleep. Since she started using a hydrotherapy tub, the jetted hot water produced by the tub helps to significantly reduce her pain on a temporary basis allowing her to sleep uninterrupted for longer periods, to meaningfully increase her functioning, and to substantially reduce the amount of narcotic pain killers she must take. Holmes Dec. ¶8.

"[S]ince prior to 2003 through the present Ms. Holmes has suffered from permanent disabling medical conditions that have substantially limited her daily activities for which hydrotherapy has in the past and would continue to be effective in alleviating her pain, improving her functioning, and increasing her ability to concentrate and sleep." *Id.* at 10:7-11.

MacDONALD HOAGUE & BAYLESS
1500 HOGE BUILDING
705 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1745
(206) 622-1604
FAX: (206) 343-3961

**Ms. Holmes asked Her Landlords to Reasonably Accommodate Her Disabilities with Her Hydrotherapy Tub**

The following facts are admitted by the Defendants in their Answer or are drawn from the testimony of the Defendants and their lawyer, Victor Haglund, their answers to written discovery, and their written correspondence.

In 2003, Plaintiff Kathleen Holmes rented an apartment from Defendants in an apartment complex at 3326 Hoyt Avenue, Everett, Washington. Complaint (Dkt. 2) ¶ 4.7; Answer (Dkt. 15) ¶ 4.7. Defendants are a husband and wife, Hans and Ellen Bersas, and their two grown sons, Rolf and Erik Bersas. R. Bersas's Answer to Plaintiff's Interrogatory 2, Exh. 1 to Wing Dec. (All exhibits are to Declaration of Jesse Wing). The Defendants co-own and operate the Hoyt Street apartment complex. *Id.*; Complaint ¶¶ 3.2-3.5; Answer ¶¶ 3.2-3.5; H. Bersas Dep. at 15:25-16:8; 17:20-24; 21:24-29:5, Exh. 2.

Ms. Holmes told Defendants Hans and Rolf Bersas that she suffers medical conditions and that she needed to install a hydrotherapy tub at her apartment for "pain control." H. Bersas Dep. at 235:16-236:3, Exh. 2; R. Bersas Dep. at 36:16-37:1, Exh. 3. In about mid-October 2003 (approximately one month after she moved in), Ms. Holmes asked Hans Bersas to allow her to install her hydrotherapy tub. H. Bersas Dep. at 125:12-18, Exh. 2. He denied her request, saying there was no room for the tub. *Id.* at 125:19-126:8. About three weeks later (November), Ms. Holmes again asked Hans Bersas to allow her to install her tub. *Id.* at 126:9-18. Again, he denied her request on the ground that there was no room.[2] *Id.* at 126:22-127:6.

Defendant Rolf and Hans Bersas subsequently installed a tub owned by Ms. Holmes outside her apartment, including the electrical connections. Complaint ¶¶ 4.10-4.13; Answer ¶¶4.10-4.13; R. Bersas Dep. at 53:12-54:1, Exh. 3. For installing her tub, Ms. Holmes paid Rolf Bersas $500, the amount he requested. Complaint ¶ 4.10; Answer ¶4.10.

---

[2] The parties' accounts differ because the Plaintiff alleges that Hans Bersas agreed to install the tub before she signed the lease and moved in, but then delayed doing so for several months. But for the purpose of this motion, Plaintiff accepts Hans Bersas's account in which he refuses, twice, to engage in the interactive process delaying the installation of the tub for several months.

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT - 5
USDC WDW NO. C06-1627TSZ

MacDONALD HOAGUE & BAYLESS
1500 HOGE BUILDING
705 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1745
(206) 622-1604
FAX: (206) 343-3961

Prior to installing the tub, Rolf Bersas told one of his tenants, Dawn April Williams, that Ms. Holmes had requested to have the tub installed "for pain relief," and Ms. Williams warned him it could cause problems. R. Bersas Dep. at 46:18-47:12, Exh. 3. Rolf Bersas had an intimate and romantic relationship with Ms. Williams, but stopped because she "was not comfortable being in a relationship with me with Kathy Holmes living downstairs," although he could not explain why she felt that way. *Id.* at 57:17-61:11.

After the tub was installed, Defendants claim that Ms. Williams (Apt. 4) and another tenant, Sascha Roland (Apt. 2), complained that Ms. Holmes's tub was noisy. R. Bersas Dep. at 73:23-75:7, 130:2-13, Exh. 3. Ms. Williams had also complained that Ms. Roland's family caused various problems, H. Bersas Dep. at 248:15-250:14, Exh. 2, including causing noise, which Rolf Bersas stated had occurred often, R. Bersas Dep. at 78:10-79:14; 84:19-85:1; 85:16-18, Exh. 3. Ms. Williams complained twice that another tenant named Heredia (Apt. 6) was making noise. *Id.* at 72:22-73:22. And Ms. Williams has complained that a family in another apartment was making noise. H. Bersas Dep. at 57:11-17, Exh. 2. Ms. Williams complained more than any other tenant Hans Bersas has ever had, since he became a landlord in 1970. *Id.* at 16:17-22; 98:11-13.

Further, Ms. Williams had complained that a light on the building outside her apartment was causing a humming sound that Hans Bersas found indistinguishable from the hum caused by Ms. Holmes's tub. H. Bersas Dep. at 278:16-19, Exh. 2 (Q: Is it, was the light hum louder or less loud than the tub? A: It, it, it hums. When those lights are humming, I can hear it when I walk by it. When I've walked by the tub, I could hear that humming. To me that sounds the same.) Likewise, Rolf Bersas could hear the light humming when he was in Ms. Williams's apartment, and does not know if he could distinguish between the sound made by the tub and the sound made by the light. R. Bersas Dep. at 234:16-235:25, Exh. 3.

Rolf Bersas says that to find a solution, he "called several hot tub companies over the phone" and asked an employee of the repair center at Rich's Spa in Lynnwood but he was told

MacDONALD HOAGUE & BAYLESS
1500 HOGE BUILDING
705 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1745
(206) 622-1604
FAX: (206) 343-3961

that there was no way to reduce the noise of her tub. R. Bersas Dep. at 106:15-107:1. He cannot identify any of the tub companies that he called, the name of any person he spoke to at these companies, and has no idea who he spoke to at Rich's Spa and whether that person was qualified to express a relevant opinion. *Id.* at 108:24-111:9. And, Mr. Bersas did not know the name or model of Ms. Holmes's tub. *Id.* at 107:5-6. Further, he was uncertain but believed her tub was more than five years old. *Id.* at 106:8-15. Rolf Bersas testified that the employee at Rich's Spa told him that: "newer tubs are quieter. New tubs have more insulation. Newer tubs are better designed, designed in different ways to reduce noise." *Id.* at 107:18-21. So, he relied on the opinion that "There's nothing that can be done" despite the fact that he did not present the employee with the "make, model or year" of Ms. Holmes's tub. *Id.* at 107:24-108:17.

Then, Rolf Bersas hired a lawyer and asked Ms. Roland to give a written complaint about the tub noise so he could give it to his attorney. R. Bersas Dep. at 131:11-132:5. The lawyer, Victor Haglund, represented all of the Defendants. H. Bersas Dep. at 66:6-17, Exh. 2.

A few weeks after the tub was installed, on or about May 4, 2004, Ms. Holmes received a letter dated April 27, 2004 from Defendants' attorney, Victor Haglund, stating that there had been complaints of "excessive noises" about the "hum" from the tub's pump. Exh. 4; R. Bersas Dep. at 117:32-118:11, Exh. 3. Mr. Haglund's letter concluded, "In short, it is necessary that the hot tub cease operation on May 10th, 2004," and declared that "there is no 'bargaining' in regard to the hot tub remaining operational at its present location, as unfortunately it is to [sic] loud for the other tenants in the apartment complex." Exh. 4.

On May 10, 2004, Rolf and Hans Bersas arrived at Plaintiff's unit. R. Bersas Dep at 111:17-23, Exh. 3. Ms. Holmes asked "to put flexible insulation in the motor cavity" to reduce any noise. *Id.* at 111:19-113:6. But Defendants denied her request. *Id.* at 112:24-113:6. Then, they removed the tub's electrical system by ripping out the wiring and digging up the buried conduit from the power source rendering the tub non-functional. H. Bersas Dep. at 89:13-22; 112:14-113:7, Exh. 2; R. Bersas Dep. at 121:19-20, Exh. 3. The Bersases also removed a fence

MacDONALD HOAGUE & BAYLESS
1500 HOGE BUILDING
705 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1745
(206) 622-1604
FAX: (206) 343-3961

from around the hydrotherapy tub. Complaint ¶ 4.20; Answer ¶ 4.20. According to Defendants, the tub was operational from March 3, 2004 until May 10, 2004, or nine weeks. R. Bersas Dep. at 219:11-16, Exh. 3.

Then, the Fair Housing Center of South Puget Sound wrote a letter dated June 3, 2004 on Ms. Holmes's behalf asking Defendants to afford Ms. Holmes a reasonable modification/accommodation by allowing her to use her hydrotherapy tub at her residence. Exh. 5, at 2.

By letter dated June 14, 2004, Mr. Haglund responded to the Fair Housing Center stating that "You apparently don't understand that the other tenants do not have to tolerate the noise that was coming from the Hot Tub. Now, of course the Hot Tub must be removed so that the deck can be replaced." *Id.* at 1. The letter threatened, "If Kathy Holmes does not designate where she wants the Hot Tub to be moved to, the Tub will be 'disposed of' in the most expeditious manner." *Id.* He sent a similar letter to Ms. Holmes the same day. Exh. 6; Haglund Dep. at 51:21-24, Exh. 7. By disposal, Mr. Haglund meant that Defendants would throw Ms. Holmes's tub in the trash. Haglund Dep. at 52:12-24. Mr. Haglund set a deadline for Ms. Holmes to remove of the tub within five days of his letter. Exh. 6. Shortly thereafter, Ms. Holmes removed her tub from the Defendants' property. Complaint ¶4.24; Answer ¶4.24. At the end of her lease, Ms. Holmes moved out. Complaint ¶4.26; Answer ¶4.26.

Rolf Bersas did not fix the light which was causing a hum in Ms. Williams's apartment until after he uninstalled Ms. Holmes's tub. R. Bersas Dep. at 238:3-239:23, Exh. 3. He has no opinion on why he removed her tub before fixing the light to see if that resolved the humming sound in Ms. Williams's apartment. *Id.*

## ARGUMENT

### A.   Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT - 8
USDC WDW NO. C06-1627TSZ

MacDONALD HOAGUE & BAYLESS
1500 HOGE BUILDING
705 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1745
(206) 622-1604
FAX: (206) 343-3961

matter of law." Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To defeat summary judgment, the nonmovant must demonstrate the existence of facts that could support a jury finding in its favor. *Id.* at 248-49. Rule 56 provides that a party may move for summary judgment on "any part" of a claim. Fed. R. Civ. P. 56(a).

Here, the essential facts necessary to determine the issues presented are undisputed and Plaintiff is entitled to partial judgment as a matter of law.

## B. The Federal Fair Housing Act Protects Tenants with Disabilities

The federal Fair Housing Act (FHA) entitles each person "the opportunity to live in an apartment free of housing discrimination." *Harris v. Itzhaki*, 183 F.3d 1043, 1054 (9th Cir. 1999). The FHA implements a policy to which Congress has accorded the highest national priority and is to be liberally construed in accordance with that purpose. 42 U.S.C. § 3601; *Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 209 (1972).

Nearly thirty years ago, Congress amended the FHA to make it unlawful to "discriminate against any person . . . in the provision of services or facilities in connection with [his] dwelling, because of a handicap" of that person.[3] 42 U.S.C. § 3604(f)(2). Discrimination includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford [a disabled] person equal opportunity to use and enjoy a dwelling. . . ." 42 U.S.C. §3604(f)(3)(B); 24 C.F.R. § 100.204.

"In amending the Fair Housing Act . . . in 1988, one of Congress's explicit motivations was to extend federal protections against housing discrimination to individuals with physical or mental handicaps." *Bangerter v. Orem City Corp.*, 46 F.3d 1491, 1498 (10th Cir. 1995); *see also Larkin v. Michigan Dept. of Social Servs.*, 89 F.3d 285, 288-89 (6th Cir. 1996) (FHAA "expanded the coverage of the FHA to include people with disabilities.").

---

[3] The terms "disability" and "disabled" are synonymous with "the FHAA's statutory language, which uses 'handicap' and 'handicapped.'" *McGary v. City of Portland*, 386 F.3d 1259, 1262 n. 2 (9th Cir. 2004).

MacDONALD HOAGUE & BAYLESS
1500 HOGE BUILDING
705 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1745
(206) 622-1604
FAX: (206) 343-3961

### 1. Defendants Were Obligated to Reasonably Accommodate Ms. Holmes's Disabilities

The Ninth Circuit has "repeatedly interpreted [the FHAA] as imposing an 'affirmative duty' on landlords and public agencies to reasonably accommodate the needs of disabled individuals." *McGary v. City of Portland*, 386 F.3d 1259, 1261 (9th Cir. 2004) (citing as examples *Giebeler v. M & B Assocs.*, 343 F.3d 1143, 1146-47 (9th Cir. 2003); *United States v. Cal. Mobile Home Park Mgmt. Co.*, 29 F.3d 1413, 1416 (9th Cir. 1994); *City of Edmonds v. Wash. State Bldg. Code Council*, 18 F.3d 802, 806 (9th Cir. 1994), *aff'd sub nom.*, *City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725 (1995)).

The affirmative duty of landlords is true "not only with regard to the physical accommodations, *see* 42 U.S.C. § 3604(f)(3)(A) and (C), but also with regard to the administrative policies governing rentals," *Giebeler v. M&B Assocs.*, 343 F.3d 1143, 1146-47 (9th Cir. 2003).

The purpose of the reasonable accommodation requirement "is to guard against the facade of 'equal treatment' when particular accommodations are necessary to level the playing field." *McGary v. City of Portland*, 386 F.3d 1259, 1267 (9th Cir. 2004).

Accordingly, as her landlords, Defendants had an affirmative obligation to afford Ms. Holmes the reasonable accommodation she needed so that she could have the same opportunity to live in the Defendants' apartments as their non-disabled tenants.

To prevail on a reasonable accommodation claim under the Fair Housing Act Amendments (FHAA), the Plaintiff "must prove the following: (1) that she is handicapped under 42 U.S.C. § 3602(h); (2) that the Defendants knew or should reasonably be expected to know of the handicap; (3) that accommodation of the handicap may be necessary to afford her an equal opportunity to use and enjoy the dwelling; (4) that the accommodation is reasonable; and (5) that Defendants refused to make the requested accommodation." *Dubois v. Ass'n of Apt. Owners*, 453 F.3d 1175, 1179 (9th Cir. 2006). Notably, unlike disparate treatment claims, "Denial of reasonable accommodation claims do not require that the Plaintiff show intent." *Howard v.*

MacDONALD HOAGUE & BAYLESS
1500 HOGE BUILDING
705 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1745
(206) 622-1604
FAX: (206) 343-3961

*Gutierrez*, 405 F. Supp. 2d 13, 15 (D.D.C. 2005); *Nadler v. Harvey*, 19 Am. Disabilities Cas. (BNA) 1084, 2007 U.S. App. LEXIS 20272, *10-11 (11th Cir. 2007) (same).

"[T]he plaintiff need only show that an accommodation 'seems reasonable on its face, i.e., ordinarily or in the run of cases.' Once the plaintiff has made this showing, the burden shifts to the defendant to demonstrate that the accommodation would cause undue hardship in the particular circumstances." *Giebeler v. M&B Assocs.*, 343 F.3d 1143, 1156 (9th Cir. 2003) (citation omitted).

As explained below, Ms. Holmes establishes that her request for her hydrotherapy tub due to her disabilities was a reasonable accommodation, which Defendants delayed and denied in violation of the FHAA. She meets each element of her claim, as a matter of law.

### 2. Ms. Holmes is Covered by the FHAA

The FHAA defines "handicap" as "a physical or mental impairment[4] which substantially limits one or more of such person's major life activities."[5] 42 U.S.C. § 3602(h)(1).

There can be no genuine dispute that Ms. Holmes suffers from handicaps that substantially limit her major life activities. Her severe and permanent spinal osteoarthritis, fibromyalgia, migraines, and depression are impairments that adversely impact virtually every aspect of her waking and sleeping life. *See, e.g., Gordon v. District of Columbia*, 480 F. Supp. 2d 112, 116 (D.D.C. 2007) ("Arthritis certainly qualifies as an impairment under the statutes."); *Swanson v. Univ. of Cincinnati*, 268 F.3d 307, 314 (6th Cir. 2001) ("the parties do not dispute that major depression is a mental impairment"); *Schneiker v. Fortis Ins. Co.*, 200 F.3d 1055, 1061 (7th Cir. 2000) (holding major depression can be a disability).

---

[4] "Physical or mental impairment includes: (1) Any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: Neurological; musculoskeletal; special sense organs; respiratory, including speech organs; cardiovascular; reproductive; digestive; genito-urinary; hemic and lymphatic; skin; and endocrine." 24 CFR 100.201(a).
[5] "Major life activities means functions *such as* caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working. 24 CFR 100.201(b) (emphasis added). This list is illustrative, not exhaustive. Indeed, this Circuit has also found that sleeping and thinking are major life activities. *Head v. Glacier Northwest, Inc.*, 413 F.3d 1053, 1060 (9th Cir. 2005).

MacDONALD HOAGUE & BAYLESS
1500 HOGE BUILDING
705 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1745
(206) 622-1604
FAX: (206) 343-3961

Her own testimony and that of her credentialed and experienced expert, Dr. Paul Brown, make clear that her disabling medical conditions substantially limit her major life activities of caring for herself, performing manual tasks, walking, sitting, standing, working, concentrating, and sleeping.

### 3. Ms. Holmes's Hydrotherapy Tub was a Reasonable Accommodation

Defendants cannot rebut the evidence that installing Ms. Holmes's hydrotherapy tub was reasonable. She suffers from severe documented disabilities which substantially limit her major life activities; hydrotherapy is a well-recognized medically needed treatment for her disabilities; the tub provided her therapeutic relief from the pain she suffered due to her well-documented disabilities; she owned the tub; she paid for the installation and operation of the tub; and the tub was installed right outside her apartment. On its face, Ms. Holmes's hydrotherapy tub was a reasonable accommodation.

A number of court opinions support the conclusion that landlords must accommodate physical disabilities to alleviate pain and allow the tenant use and enjoyment of their apartment. For example, in requiring landlords to make reasonable accommodations under the Fair Housing Act by providing handicapped parking spaces for handicapped tenants, the Ninth Circuit has explained that "the handicapped person faces injury or pain by having to travel long distances from the house to the car...without a parking space close to the apartment, the handicapped individual's use and enjoyment of the dwelling is diminished." *United States v. California Mobile Home Park Management Company*, 107 F.3d 1374, 1381 (9th Cir.1997). Under the Fair Housing Act, "Balanced against a landlord's economic or aesthetic concerns as expressed in a no-pets policy, a deaf individual's need for the accommodation afforded by a hearing dog is, we think, *per se reasonable* within the meaning of the statute." *Bronk v. Ineichen*, 54 F.3d 425, 429 (7th Cir. 1995) (emphasis added).

Several other opinions illustrate the same points. *See, e.g., Giebeler v. M&B Assocs.*, 343 F.3d 1143 (9th Cir. 2003) (holding landlord liable under Fair Housing Act for refusing to waive

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT - 12
USDC WDW NO. C06-1627TSZ

MacDONALD HOAGUE & BAYLESS
1500 HOGE BUILDING
705 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1745
(206) 622-1604
FAX: (206) 343-3961

policy so tenant applicant's mother could co-sign the lease because tenant, who suffered from AIDS, was unable to work so unable to meet the minimum financial qualifications of the apartment by himself); *McGary v. City of Portland*, 386 F.3d 1259 (9th Cir. 2004) (reversing dismissal of Fair Housing Act claim where individual contended that the city denied his request for additional time to clean his yard in order to comply with the city's nuisance abatement ordinance due because of his illness); *see also Rodriguez v. Montalvo*, 337 F. Supp. 2d 212 (D. Mass. 2004) (granting motion to attach landlord's property finding likelihood of success by tenant where landlord refused tenant's request to modify her apartment to accommodate her son's disabilities, despite tenant's offer to pay for modifications, finding requested modifications reasonable (removing portion of porch, affixing wheelchair ramp to door and widening door frame, and converting window into door with wheelchair ramp); *United States v. Freer*, 864 F. Supp. 324 (W.D.N.Y. 1994) (holding landlord must allow disabled individual to install her proposed "wrap around" wheelchair ramp which can be disassembled within 3 hours, will not impede removal of trailer, and probably will not impede traffic in driveway and on access road, because landlord did not prove request unreasonable); 24 CFR 100.204 (examples listed as reasonable accommodations).

In sum, Plaintiff's request to use her hydrotherapy tub was a reasonable accommodation within the meaning of the Fair Housing Act.

### 4. Defendants Were Obligated to Engage in the Interactive Process

In the Ninth Circuit, the interactive process is mandatory. *Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1089 (9th Cir. 2002) (citing with approval *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1112 (9th Cir. 2000) (en banc), vacated on other grounds, *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391 (2002). Indeed, it is essential to achieving the goals of anti-discrimination laws protecting persons with disabilities. *Barnett*, 228 F.3d at 1113. The Court has explained that "this obligation is triggered by an employee or an employee's representative giving notice of the employee's disability and the desire for accommodation." *Id.*

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT - 13
USDC WDW NO. C06-1627TSZ

MacDONALD HOAGUE & BAYLESS
1500 HOGE BUILDING
705 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1745
(206) 622-1604
FAX: (206) 343-3961

"The interactive process requires: (1) direct communication between the employer and employee to explore in good faith the possible accommodations; (2) consideration of the employee's request; and (3) offering an accommodation that is reasonable and effective." *Zivkovic*, 302 F.3d at 1089.

"'Liability for failure to provide reasonable accommodations ensues only where the employer bears responsibility for the breakdown' in the interactive process.'" *Id.* (quoting *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1137 (7th Cir. 1996)).

In the context of fair housing, a landlord's obligation is triggered by notice of the tenant's disability and desire for accommodation. Defendants admit they were given notice of Ms. Holmes's need and request for an accommodation. And, as explained below, Defendants admit repeatedly cutting off the interactive process, for which they are liable.

### 5. By Repeatedly Refusing to Engage in the Interactive Process Defendants Violated the FHAA

Four separate times, Defendants refused to engage in the interactive process—twice before the tub was installed, and twice afterwards. Hans Bersas says that on two occasions he rejected Ms. Holmes's request to install her tub. Then, not long after Defendants installed her tub they ripped it out again without engaging in any interactive process with Ms. Holmes about other options. Indeed, Defendants had their lawyer send her a letter notifying her that her tub would be rendered non-functional and there would be "no bargaining." Then, when she nevertheless asked to attempt to abate noise from the tub by insulating the motor, Defendants unequivocally refused, and proceeded to remove the electrical connections. Finally, in response to a letter from the Fair Housing Center, Defendants' lawyer again rejected Ms. Holmes's request for accommodation without any discussion.

"The duty to accommodate 'is a "continuing" duty that is "not exhausted by one effort."'" *Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1138 (9th Cir. 2001).

As a matter of law, by refusing to engage in the interactive process after having installed the tub, Defendants are liable for having prevented Ms. Holmes from experimenting with various

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT - 14
USDC WDW NO. C06-1627TSZ

MacDONALD HOAGUE & BAYLESS
1500 HOGE BUILDING
705 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1745
(206) 622-1604
FAX: (206) 343-3961

methods of reducing the purported noise caused by the tub to facilitate a reasonable accommodation for her.

Defendants' failure here is akin to the employer's liability to accommodate a disabled employee, as explained by the Seventh Circuit: "It is here that United flunked its obligations under the ADA. In the face of Gile's repeated pleas for a shift transfer, United refused her request for a modest accommodation, then did nothing to engage with Gile in determining alternative accommodations that might permit Gile to continue working. McGuffin provided no help at all except to suggest that Gile 'just resign and stay home.'" *Gile v. United Airlines, Inc.*, 213 F.3d 365, 373 (7th Cir. 2000).

Here, Defendants' outright refusal to engage in the interactive process to address their perceived concerns about the accommodation reveals bad faith that violated the law.

> The interactive process would have little meaning if it was interpreted to allow employers, in the face of a request for accommodation, simply to sit back passively, offer nothing, and then, in post-termination litigation, try to knock down every specific accommodation as too burdensome. That's not the proactive process intended: it does not help avoid litigation by bringing the parties to a negotiated settlement, and it unfairly exploits the employee's comparative lack of information about what accommodations the employer might allow.

*Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 315-16 (3d Cir. 1999). "[B]ecause employers have a duty to help the disabled employee devise accommodations, an employer who acts in bad faith in the interactive process will be liable if the jury can reasonably conclude that the employee would have been able to perform the job with accommodations." *Id.* at 317-18.

Having ripped out the wiring for the tub and ordered Ms. Holmes to remove it before experimenting with various ways to reduce the alleged noise, Defendants are precluded from trying to show that the noise could not be sufficiently abated through a variety of common sense measures, including: (a) adding or improving insulation of the tub; (b) adding insulation to the fence surrounding the tub; (c) adjusting the height of the fence to direct sound away from the building; (d) inserting padding underneath the tub; (e) isolating shaking parts of the tub; (f) re-orienting the pump of the tub away from the building; (g) adding padding to the underside of the

MacDONALD HOAGUE & BAYLESS
1500 HOGE BUILDING
705 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1745
(206) 622-1604
FAX: (206) 343-3961

deck above the tub; (h) repairing glazing on the windows of the two complaining neighbors; (i) blowing insulation into the walls of the two complaining neighbors; and (j) experimenting with other abatement methods. Indeed, Rolf Bersas testified that he was told some tubs are quieter than others so Defendants cannot show that Ms. Holmes's tub could not be rendered quieter using a range of methods.

"As long as a reasonable accommodation available to the employer could have plausibly enabled a handicapped employee to adequately perform his job, an employer is liable for failing to attempt that accommodation." *Kimbro v. Atlantic Richfield Co.*, 889 F.2d 869, 879 (9th Cir.), *cert. denied*, 498 U.S. 814 (1990). "Employers, who fail to engage in the interactive process in good faith, face liability for the remedies imposed by the statute if a reasonable accommodation would have been possible." *Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1137-1138 (9th Cir. 2001). The same is true of landlords, and the Defendants are liable on this basis.

Ms. Holmes asked for the opportunity to quiet her tub but Defendants flatly refused telling her she would just have to live without. They are liable under the Fair Housing Act.

### 6. By Delaying the Installation of Ms. Holmes's Tub, Defendants Violated the FHAA

"'[U]nder the Fair Housing Act . . . a violation occurs when the disabled resident is first denied a reasonable accommodation, irrespective of the remedies granted in subsequent proceedings.'" *Groome Resources, Ltd. v. Parish of Jefferson*, 234 F.3d 192, 199 (5th Cir. 2000) (*quoting Bryant Woods Inn, Inc. v. Howard County, Md.*, 124 F.3d 597, 602 (4th Cir. 1997). "This denial can be both actual or constructive, as an indeterminate delay has the same effect as an outright denial." *Groome Resources, Ltd.*, 234 F.3d at 199 (affirming the district court's holding that Defendant violated the Fair Housing Act by unreasonably delaying the Plaintiff's reasonable accommodation).

Here, Defendants admit they delayed the installation of Ms. Holmes's tub from mid-October 2003 when she first requested the accommodation until March 2004. Ms. Holmes's lease was for 12 months. Defendants' five month delay deprived Ms. Holmes of her

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT - 16
USDC WDW NO. C06-1627TSZ

MacDONALD HOAGUE & BAYLESS
1500 HOGE BUILDING
705 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1745
(206) 622-1604
FAX: (206) 343-3961

accommodation for nearly half of her tenancy. As a matter of law, this unreasonable and unjustifiable delay constituted a violation of the FHAA.

## C. Washington Law Against Discrimination

As with the FHAA, the Washington Law Against Discrimination ("WLAD") prohibits discrimination in the rental and conditions of housing based on disability. The law provides: "It is an unfair practice for any person, whether acting for himself, herself, or another, because of... the presence of any sensory, mental, or physical disability...To discriminate against a person in the terms, conditions, or privileges of a real estate transaction or in the furnishing of facilities or services in connection therewith." RCW 49.60.222(1)(b). The provision defines disability discrimination to include: "To refuse to make reasonable accommodation in rules, policies, practices, or services when such accommodations may be necessary to afford a person with the presence of any sensory, mental, or physical disability...or physically disabled person equal opportunity to use and enjoy a dwelling. *Id.* at (2)(b).

To establish a reasonable accommodation claim under WLAD in the employment context, the Plaintiff would need to show: "(1) the employee had a sensory, mental, or physical abnormality that substantially limited his or her ability to perform the job; (2) the employee was qualified to perform the essential functions of the job in question; (3) the employee gave the employer notice of the abnormality and its accompanying substantial limitations; and (4) upon notice, the employer failed to affirmatively adopt measures that were available to the employer and medically necessary to accommodate the abnormality." *Riehl v. Foodmaker, Inc.*, 152 Wn.2d 138, 145, 94 P.3d 930, 934 (2004). In the housing context, the third element is modified to require that the tenant otherwise qualify for the housing.

The burden of establishing that she is covered under WLAD is far easier than under the FHAA, and Ms. Holmes easily satisfies that burden. "[T]he statutory protections against discrimination are to be liberally construed." *Phillips v. Seattle*, 111 Wn.2d 903, 766 P.2d 1099, 1102 (1989). And, rather than focusing on whether her medical condition substantially limits a

MacDONALD HOAGUE & BAYLESS
1500 HOGE BUILDING
705 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1745
(206) 622-1604
FAX: (206) 343-3961

major life activity, to be covered under the WLAD she need only have a diagnosable medical condition, which she indisputably has.

At all relevant times, Ms. Holmes suffered and continues to suffer from a sensory, mental, or physical disability, namely severe spinal osteoarthritis, fibromyalgia, migraines, and depression. Her medical conditions are covered under the WLAD. *See, e.g., Goodman v. Boeing Co.*, 75 Wn. App. 60, 877 P.2d 703 (1994), *aff'd*, 127 Wn.2d 401, 899 P.2d 1265 (1995) (affirming jury verdict for failing to provide reasonable accommodations for employee suffering from moderate osteoarthritis and tennis elbow). Ms. Holmes has been medically diagnosed with these conditions by her doctors since 1993. At all relevant times, these conditions cause her to suffer limitations in her ability to function, including her ability to sit, stand, walk, do repetitive tasks, work, concentrate, and sleep. As a result of these conditions, Ms. Holmes suffers severe and disabling pain on a daily and nightly basis. Rolf Bersas testified that he had no reason to doubt that Ms. Holmes suffered from a disability for which she needed a hydrotherapy tub to relieve her pain.

"[T]he employee must provide competent evidence establishing a nexus between the disability and the need for accommodation. This requirement is not burdensome; it simply requires evidence in the record that a disability requires accommodation.... Medical expert testimony may or may not be required depending on the obviousness of the medical need for accommodation in the sound discretion of the court." *Riehl*, 94 P.3d at 934.

The testimony of Ms. Holmes and her expert, Dr. Brown, satisfies the standard. Well before her tenancy with Defendants, Ms. Holmes regularly used hydrotherapy to relieve her pain and increase her functioning. Dr. Brown testified that hydrotherapy is well-recognized as a form of treatment to relieve pain for osteoarthritis and fibromyalgia, and cited to the studies which support his opinion. He testified that if she was his patient, he would prescribe hydrotherapy for Ms. Holmes and that her medical records and testimony support his medical opinion that she needs such therapy. And, Ms. Holmes has testified that she achieve relief from her severe pain

MacDONALD HOAGUE & BAYLESS
1500 HOGE BUILDING
705 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1745
(206) 622-1604
FAX: (206) 343-3961

and improved functioning and sleep by soaking full body in a tub of hot water flowing from water jets of the kind found in a hot tub.

As with the FHAA, under the WLAD, once the Defendants learned of Ms. Holmes's disabilities, they had a duty to engage in an interactive process to determine the nature and extent of her disabling limitations and identify and provide reasonable accommodations. *See Dean v. Metropolitan Seattle*, 104 Wn.2d 627, 708 P.2d 393, 399 (1985). "The *Dean* case illustrates the employer's affirmative duty to accommodate an employee's disability by *affirmatively assisting* the disabled employee in finding another position within the organization, if necessary." *Sommer v. DSHS*, 104 Wn. App. 160, 15 P.3d 664, 670-71 (2001) (emphasis in original) (discussing interactive process). *See also Kimbro v. Atlantic Richfield Co.*, 889 F.2d 869, 877 n.7 (9th Cir. 1989) (regarding WLAD claims).

Indeed, the Defendants had a duty to initiate and engage in the interactive process and affirmatively search for an accommodation. *Dean v. Metro*, 104 Wn.2d 627, 708 P.2d 393, 399 (1985) (liability found where employer "did not determine the extent of [employee's] disability" and "left the initiative to him" for finding accommodation); *Sommer v. DSHS*, 104 Wn. App. 160, 15 P.3d 664, 671 (2001) (reversing jury verdict for employer where employer failed to affirmatively accommodated Plaintiff and remanding for trial on damages only).

By their own admissions, Defendants twice rejected Ms. Holmes's request for a reasonable accommodation without any discussion and then after the tub was installed they refused to engage in any discussion with her about addressing their concerns, as illustrated by their lawyer's written notification to Ms. Holmes that her tub must be removed and that there will be "no bargaining." Hans Bersas's attitude is summed up in his own words:

MacDONALD HOAGUE & BAYLESS
1500 HOGE BUILDING
705 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1745
(206) 622-1604
FAX: (206) 343-3961

Q:   What is it that you expected Ms. Holmes to do once you told her that there were complaints about the noise that her tub was producing?

A:    I went to the lawyer to get advice what to do....Well, I expected for that tub to be shut down.

H. Bersas Dep. at 224:21-225:2, Exh. 2.

The Supreme Court of Washington could have been describing the Bersases' misconduct towards Ms. Holmes when it wrote that "The record in this case reflects appellant was aware of respondent's disability and physical limitations. . . .Several options were potentially available to appellant which would have accommodated respondent. The appellant, however, chose not to accommodate him." *Holland v. Boeing Co.*, 90 Wn.2d 384, 583 P.2d 621, 624 (1978).

As a matter of law, the Bersases are liable to Ms. Holmes for repeatedly refusing to engage in the interactive process with her, delaying installation of her hydrotherapy tub, and ripping it out instead of allowing her at her own cost to quiet the tub so she could continue using it to relieve her pain and live in her apartment.

## CONCLUSION

Wherefore, because Plaintiff has established as a matter of law that Defendants failed to provide her a reasonable accommodation under the Fair Housing Act and the Washington Law Against Discrimination, Plaintiff asks the Court to grant partial summary judgment in her favor holding as follows:

(1) That Plaintiff Kathleen Holmes suffers from severe spinal osteoarthritis, fibromyalgia, migraines, and depression to an extent that constitute disabilities within the meaning of the federal Fair Housing Act, 42 U.S.C. §3601 et seq. and the Washington Law Against Discrimination, RCW 49.60.222;

(2) That for Defendants' apartment to be available to Ms. Holmes within the meaning of the FHAA and WLAD, Ms. Holmes needed a reasonable accommodation or modification to

MacDONALD HOAGUE & BAYLESS
1500 HOGE BUILDING
705 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1745
(206) 622-1604
FAX: (206) 343-3961

relieve her pain and increase her functioning in the form of a hydrotherapy tub installed and maintained at her expense;

(3) That Defendants refused to engage in the "interactive process" with Ms. Holmes about her request for a reasonable accommodation or modification in the form of her tub; and

(4) That Ms. Holmes's requested accommodation in the form of her tub was reasonable;

(5) That Defendants delayed and then denied Ms. Holmes's requested reasonable accommodation; and

(6) That Defendants' refusal to engage in the interactive process and denial of Ms. Holmes's request to use her hydrotherapy tub installed and maintained at her own expense violated the FHAA and the WLAD.

DATED the 29th day of November, 2007.

Respectfully submitted,

MacDONALD HOAGUE & BAYLESS

By _____
Jesse Wing, WSBA #27751
Joseph R. Shaeffer, WSBA #33273
Attorneys for Plaintiff

MacDONALD HOAGUE & BAYLESS
1500 HOGE BUILDING
705 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1745
(206) 622-1604
FAX: (206) 343-3961

**CERTIFICATE OF SERVICE**

I hereby certify that on November 29, 2007, I electronically filed the foregoing to the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

- **Harold Basil Field**
  Hal@murraydunham.com,jason@murraydunham.com,sherry@murraydunham.com

By  /s/ Jesse Wing
Jesse Wing, WSBA #27751
jessew@mhb.com
Joseph R. Shaeffer, WSBA #33273
josephs@mhb.com
Attorneys for Plaintiff

MacDONALD HOAGUE & BAYLESS
1500 HOGE BUILDING
705 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1745
(206) 622-1604
FAX: (206) 343-3961